1

2

3

4

5

6

7                                UNITED STATES DISTRICT COURT

8                                EASTERN DISTRICT OF CALIFORNIA

9

10   LUIS ALDANA GONZALEZ,                        No.  1:13-cv-00907-AWI-SKO  HC

11                  Petitioner,                   **FINDINGS AND RECOMMENDATION
                                                  TO DENY PETITION FOR WRIT OF
12          v.                                    HABEAS CORPUS**

13   JOE A. LIZARRAGA, Warden,

14                  Respondent.

15

16          Petitioner Luis Aldana Gonzalez is a state prisoner proceeding *pro se* with a first amended

17   petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The petition alleges five grounds

18   for habeas relief: (2 and 6) presentation of a prejudicial jury instructions; (3) constitutional error

19   in denial of continuance motion; (4) excessive sentence; and (5) improper admission of evidence

20   of prior crime.[1]  Having fully reviewed the record as a whole and applicable law, the undersigned

21   recommends that the petition for habeas relief be denied.

22   **I.      Factual Background[2]**

23          Petitioner and his wife lived on a two-acre property in a small town.  They had seven

24

25   grown children (Teresa, Araceli, Luis, Faustino, Israel, Daniel, and Gabriela) and many

26   ─────────────────
     [1] On April 2. 2014, the Court dismissed claim one, which alleged ineffective assistance of counsel, as a state law
27   claim.  *See* Doc. 12.
     [2] The Court adopts the facts determined by the California Court of Appeal.  *People v. Gonzalez*, 2011 WL 5946927
28   (Cal. App. Nov. 29, 2011) (No. F059938).  The state court's summary of the facts in its unpublished opinion is
     presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).

                                                        1

grandchildren.  Some of the extended family lived on the same property, and a large group of family and friends would frequently gather there on weekends to socialize.

Beginning approximately in 2003, Petitioner sexually molested two granddaughters, Luis's daughter L., who was 18 years old at the time of trial, and Israel's daughter, A., who was 15 years old at the time of trial.  Petitioner's daughter Araceli testified at trial that Petitioner had also molested her when she was a child.

### A.     Petitioner's Sexual Offenses Against Granddaughter L.

Petitioner began molesting L. when she was eleven years old.  Several incidents occurred in a chicken coop at the rear of Petitioner's property while other members of the family were in the house.  On one occasion, when about 12 people were in the house playing cards, Petitioner asked L. to help him rake leaves around the chicken coop.  The two went out alone.  Inside the chicken coop, Petitioner grabbed L. and attempted to take off her shirt.  She felt uncomfortable.  Petitioner fondled L.'s breasts and vaginal area through her clothing.  He kissed her neck and cheek and called her a pet name.  Frightened, L. did not call out, but told Petitioner to leave her alone and kicked Petitioner in his crotch.   She ran crying into the house and entered the bathroom where no one could see her crying.  Petitioner molested her in the chicken house on three more occasions.[3]

On three other occasions when L. was eleven years old, Petitioner told L. they would go to a nearby store.  Petitioner instead drove his pick-up truck to an orchard.  He put his hand in L.'s lap, unzipped her pants, and inserted his fingers into L.'s vagina, causing her pain.

When L. was twelve years old, the family was gathered in the garage.  L. entered Petitioner's house and went into a closet under the stairs to get a soda.  Petitioner blocked her exit

---

[3] Testifying for the defense, Detective Klassen recalled that L. varied in the number of times she claimed to have been assaulted in the chicken house.  On cross-examination, L. testified that she had lied to Police Detective Rodney Klassen when she told him that Petitioner had only molested her on one occasion.  L. explained that she wanted Klassen to stop questioning her.

2

and closed the door.  He put his fingers into L.'s vagina and moved them in and out, then put her hand into his pants and onto his penis, then dropped his pants and underwear.  L. feared that Petitioner would hurt her as her father had.[4]  Although afraid and crying, L. could not break away from Petitioner's grasp or pull her hand away.  Blocking the door, Petitioner pushed her head toward his penis.

Afraid that she would get in trouble, L. did not tell anyone about the closet incident.  She never confided in her mother because her father had told her that her mother would not believe her.  She did not tell her father because she was afraid of him.  When she returned home after visits to Petitioner's house, however, she cried and told her mother that she did not want to go back there.  On one occasion, she told her mother that she had a dream that Petitioner had molested her.

Several months after L.'s quinceañera, L.'s mother learned that Petitioner had molested his daughter Araceli.  From then on, L.'s mother did not allow L. and her brother to visit Petitioner's home.

**B.** **Petitioner's Sexual Offenses Against Granddaughter A.**

After school, A. rode the school bus to her great-aunt Dawn's home,[5] which was on the same property as Petitioner's house.  On weekends, A. and her family would attend the gatherings there.  Many children were always present, playing everywhere on the two-acre property.

Petitioner began molesting A. when she was eight years old.  Despite the many people present on the weekends, Petitioner would take A.'s hand and lead her upstairs to a spare bedroom and touch her inappropriately.  She would squirm and cry.  Petitioner would touch A.'s

---

[4] L. testified that her father, Luis, Jr., first had intercourse with her when she was six or seven years old.  Her parents were then separated but reconciled later. Thereafter, L.'s father had intercourse with her so many times that she could not remember or count the number of times.  When L. was 15 years old, her father had intercourse with her the day after her quinceañera and told her it would be the last time.

[5] Dawn, sometimes referred to in the record as "Aunt Donna," is Petitioner's sister-in-law.

3

vaginal area through her clothes or touch her vaginal area after removing her pants.  He removed his own pants, put A.'s hands on his penis, and made her move her hands over it.  Another time, he took off both their pants, lay down on top of her, and attempted to penetrate her vagina.  When he eventually succeeded, he moved back and forth.  Petitioner hurt A. and made her bleed.  On another occasion, Petitioner took A. into the master bedroom, removed both their pants, showed her a pornographic movie, and touched her.

Petitioner told A. not to tell anyone what they were doing or "they would take her."  Although she did not like what Petitioner was doing to her, she liked the attention and felt special.  She estimated that Petitioner touched her about 40 times and had intercourse with her about 15 times.  Once, he bit her and she cried.  Petitioner last touched her when she was nine years old.  He never told A. why he stopped, and she assumed she had done something wrong and was no longer special to him.

In 2006, A.'s parents learned that Petitioner's daughter, Araceli, had accused Petitioner of molesting her when she was a child.  As a result, they stopped taking their family to functions at Petitioner's home.  The last event the family attended was a Father's Day party in 2006.

On August 10, 2008, A. began writing in a diary.  In September or October 2008, when A. began the ninth grade, A.'s mother became worried about A.'s increasing shyness and isolation.  A.'s mother found the diary and read A.'s account of having been sexually assaulted.  Distressed, A.'s mother could read no more and called A.'s father, Israel, home from work.  Together, they immediately went to school and brought A. home.  When they told A. that they had read her diary, she began to sob and could not answer questions.  Ultimately, A. identified Petitioner but could not relate the details and referred them to the account of the rape in her diary.  On October 1, 2008, Israel, who was Petitioner's supervisor at a packing house, fired Petitioner.

//

4

Concerned about A.'s emotional and psychological well-being, A.'s parents did not immediately call police but instead found a therapist to treat A.  A.'s mother also began to drive A. to and from school daily.  Although A. benefitted from therapy, she was never able to discuss with her mother exactly what had happened.[6]

### C.      A. and L. Disclose the Sexual Assaults

Despite the difference in their ages, cousins A. and L. often spent time together.  On February 21, 2009, when A. spent the night at L.'s house, A. told L. that Petitioner had sexually assaulted A.  L. then revealed to A. that Petitioner had also assaulted L.

L. felt that A. had been assaulted because of L.'s failure to report her own assault.  When Israel arrived to pick up A. the next morning, L. asked to meet later with Israel, A.'s mother, and L.'s mother, but not her father, Luis, Jr.  Israel arranged the meeting, at which L., crying hysterically, revealed that both her father and Petitioner had molested her.  That day, A.'s mother reported Petitioner's assault on A. to the police.

As a result of her allegations, L. was ostracized by numerous family members, including her mother, brother, grandmother (Petitioner's wife), uncle (Faustino), and cousin (Elizabeth).  She was forced to move from her parent's home to the home of a maternal uncle.  Shortly after Petitioner's daughter Araceli learned of L.'s and A.'s allegations, she moved with her family from their home on Petitioner's property.

### D.      Petitioner's Sexual Offenses Against Daughter Araceli

Araceli, who was 41 years old at the time of trial, testified that Petitioner molested her when she was between 11 and 14 years old.  Despite Petitioner's molestation, she testified that she loved him and that it was hard for her to testify against him.

//

---

[6] Testifying for the defense, Detective Klassen recounted that when he interviewed A., she was embarrassed that he had read her diary and "completely shut down."  A video recording of the interview was shown at trial.

5

The first incident occurred when Araceli was sick and Petitioner was applying vapor rub to her chest in the kitchen while the rest of the family watched television in another room.  After applying the salve to Araceli's neck, Petitioner slipped his hand under her shirt and touched her breast.  Araceli was stunned and confused.  Petitioner pulled down Araceli's shirt and put his mouth on her breast and bit her nipples, causing her pain.

On another occasion, Araceli awoke on the couch to see Petitioner standing in front of her. Although her brothers and sisters were asleep in the same room, Petitioner out his hand inside her top and rubbed her breast.  When Araceli pushed his hand away, Petitioner left the room.  Araceli was too frightened to wake her siblings or tell her mother.

Another time, while the family was praying the rosary in the living room, Araceli left to use the bathroom.  Petitioner followed her in, closed the door, and attempted to touch Araceli's breast.  She pushed him away.  Petitioner motioned toward Araceli's pants, but she hung onto them.  He left and closed the door. When Araceli returned to the living room, Petitioner had resumed praying with the others.  Araceli said nothing because she did not think anyone would believe her.

The last time Petitioner assaulted Araceli, she was home sick from school and sleeping in her parents' bed.  When she opened her eyes, Petitioner was standing by the bed.  Araceli could hear people outside through the open window.  As he came toward her, Araceli loudly told him "no" and told him to stay away.  Petitioner appeared surprised, as if he did not expect Araceli to say "no."

Araceli felt ashamed and believed that the abuse was her fault for not making Petitioner stop in time.  When he drank, Petitioner would apologize to Araceli, saying that he was sorry that he hurt her and that he would not do it again.

//

6

When Araceli was a sophomore in high school, she disclosed the abuse to her older sister Teresa.  The police were called, and Araceli and Teresa were removed to foster care.  Araceli and Teresa were brought to an office to confront Petitioner, who denied assaulting Araceli.  Their mother did not believe Araceli.  Araceli never recanted,[7] but the family proceeded to treat the situation as a "misunderstanding."  Araceli never again complained about the abuse, assuming that if her mother did not believe her, no one would.

Afraid to go home, Araceli ran away with her boyfriend.  The family decided that Araceli had lied about the abuse so that she could run away.  Araceli and her boyfriend stayed in Mexico for three months, but when their money ran out, they were forced to return to the United States.  They lived apart from the family for two years, but after they married and had no money, they moved to a house on Petitioner's property to raise their family.

**E.    Pretextual Telephone Call**

With the assistance of Detective Klassen, Araceli made a pretextual telephone call to Petitioner on March 5, 2009.  Araceli asked Petitioner why Israel had fired him, but Petitioner avoided answering the question.  Araceli then asked what had happened with A. and L., and Petitioner acted like he did not know what she was talking about.  When Araceli confronted Petitioner with his earlier abuse of Araceli, he admitted that he had touched her but claimed it was a misunderstanding and that she had forgiven him.  Araceli told Petitioner that it was not a misunderstanding.  Petitioner apologized, acknowledged that what he did to Araceli was wrong, and said that they had to move on.  He denied A. and L.'s allegations and said that the situation with Araceli was a misunderstanding because he had never penetrated her.  Insisting that he had done nothing to A. or L., he stated that he would not pay for what someone else had done.

//

---

[7] Detective Klassen, testifying for the defense, recounted that when he interviewed Araceli, she told him that Teresa had retracted her allegations that Petitioner had abused Teresa, leaving Araceli alone and feeling betrayed.

### F.   **Expert Psychological Testimony**

Dr. Anthony Urquiza, a psychologist who treated sexually abused children, testified as an expert witness for the prosecution.  He characterized Child Sexual Abuse Accommodation Syndrome (CSAAS) as an educational, not a diagnostic, tool.  Abused children may exhibit some or all of the syndrome's five components.

The first component is secrecy.  Most victims are sexually abused by someone with whom they already have an ongoing relationship.  The abuser manipulates or coerces the child not to disclose the abuse.  Some victims are silent because they crave special attention and need to be connected to and loved by someone, even though they dislike being abused.  Children often put themselves in the position to be abused again because they get something important from their relationship with the abuser.

The second component is helplessness.  Abused children do not yell, scream, or report the abuse because they have been manipulated or coerced, or because they are ashamed and humiliated.  Because the children cannot protect themselves, the abuse continues.  The most likely victims are children who are more passive and less confident.

The third component is entrapment and accommodation.  The secrecy and helplessness create a trap from which children cannot escape.  They accommodate to the situation by disassociating from the horrible feelings that accompany abuse—the shame, humiliation, and disgust of someone fondling them, penetrating them, or forcing them to engage in oral copulation.  Shutting down their feelings allows the children to cope with something they cannot control.  Children who are good at disassociating may have a flat affect and may discuss what happened to them without emotion, or they may vacillate between crying and disassociating.  When children are forced to deal with their feelings about the abuse, they tend to disassociate.

//

The fourth component of the syndrome is delayed and unconvincing disclosure.  Although people commonly think children will report abuse immediately, most disclosures are significantly delayed from the onset of the abuse, often by more than a year.  In many cases, children wait until they are over 18, and some wait for decades.  Sometimes, the delay is due to fear, and sometimes, due to shame, humiliation, or guilt.  Abused children often decide to bury the secret, and when they finally disclose the abuse, their method is not direct or complete.  Instead, they gradually release information that eventually reveals the abuse.  Disclosure is a process, not an act.  When disclosure does occur, it is often unconvincing because the children's stories and excuses for not wanting to be around the abuser may be changing and inconsistent,  Further, children may not be able to recount accurately what happened, when it happened, or how many times it happened.  If the child was abused many times, the incidents will tend to run together.

The fifth component is retraction.  About 25 percent of abused children will retract some or all of their disclosure.  Some are pressured to retract by others to protect the abuser from conviction and imprisonment.

G.      **Defense Case**

Petitioner presented the testimony of multiple family members.  Each family member who testified on Petitioner's behalf set forth specific evidence that he or she believed disproved allegations of Petitioner's molestation of A., L., or Araceli.  They characterized Petitioner as much-loved and the center of attention at family gatherings, and maintained that Petitioner would not have been able to leave a family gathering for 15 to 30 minutes without his absence being noted.  (Petitioner's wife testified that he had never left the room without her since 2000.)  They described A. and L. as relating to their grandfather affectionately, without any reluctance to interact with him.  Dawn testified that while Dawn was babysitting A. and her brother after school, A. would often go next door to visit her grandparents, but that Dawn did not observe their

9

interaction because Dawn would be busy in her own home, watching A.'s brother.

L.'s mother acknowledged that she and Luis, Jr., had a rocky marriage but that she and the children had decided that the family should stay together.  L.'s family stopped going to family gatherings after L.'s quinceañera, and the children were allowed to visit Petitioner's home only when they were accompanied by Luis, Jr.  L. told her mother that Petitioner and Luis, Jr. had molested her at a time when L. was being punished and was forbidden to see her boyfriend or use the telephone.  L. lied frequently, requiring her mother to punish her.  L.'s mother disbelieved the allegations against Luis, Jr., because she had found a letter from L. to a friend, in which L. claimed that she had lost her virginity in the eighth grade.  If L. lost her virginity in the eighth grade, reasoned her mother, her father or grandfather could not have abused L. earlier.

Petitioner also presented the testimony of two of A.'s friends, who recounted various sexual and reproductive incidents of which A. had spoken.  A. denied having told some of the stories to which the friends testified.

A longtime friend of Araceli named Arjelia testified that when Arjelia inquired about gossip she had heard, Araceli denied that Petitioner had abused her.

### H.    Rebuttal Testimony

A.'s high school teacher, Eric Ford, opined that in his experience, A. was generally truthful and gave him no reason to distrust her.  Araceli testified that she and Arjelia were no longer friends and confirmed that she had told Arjelia that a rumor that Araceli had been raped was a lie.

L.'s maternal grandmother, Consuela, testified that after L. testified at trial she was sad, inconsolable, and unable to speak.  On each of the three days that L. testified, L. vomited in a court house restroom immediately after leaving the witness stand.  Consuela had known L. since birth and considered her truthful.

10

## II.   **Procedural Background**

On February 2, 2010, the Tulare County District Attorney charged Petitioner with three counts of lewd acts upon A., a child under fourteen years of age (Cal. Penal Code § 288(a)) and ten counts of forcible lewd acts against L., a child under the age of fourteen years (Cal. Penal Code § 288(b)(1)).[8]  The information further alleged as to all counts that defendant committed the sexual offenses against multiple victims (Cal. Penal Code § 667.61(b) and (e)(4)) and as to counts 1 through 4 and 9 through 13, that Petitioner had substantial sexual contact with the victims (Cal. Penal Code § 1203.066(a)(8)).

Petitioner was tried before a jury in the Tulare County Superior Court between January 26 and February 8, 2010.  On February 8, 2010, the jury found Petitioner guilty on all counts and found all special allegations to be true.

On March 11, 2010, Petitioner moved for a new trial, a mistrial, or in the alternative, modification of the verdict or dismissal of the counts.  On March 16, 2010, the trial court denied the motion and sentenced Petitioner to a 15-year-to-life consecutive term for each count, for an aggregate sentence of 195 years to life.

Petitioner filed a direct appeal on March 23, 2010.  The California Court of Appeal affirmed the judgment on November 29, 2011.  The California Supreme Court denied review on February 1, 2012.

On or about April 30, 2013, Petitioner filed a petition for writ of habeas corpus in the Tulare County Superior Court.  The superior court denied relief on May 2, 3013.

Petitioner filed a petition in this Court on June 14, 2013.  On July 9, 2013, the Court ordered Petitioner to show cause why the petition should not be dismissed for failure to exhaust all claims in state court.

---

[8] Each count identified a specific sexual assault.

The California Court of Appeal summarily denied the state petition on July 11, 2013.

On July 31, 2013, Petitioner responded to the federal order to show cause and moved for an order of stay and abeyance pending the issuance of the decision on the petition pending in the California Supreme Court.

The California Supreme Court summarily denied the state petition on October 16, 2013.

Petitioner filed his first amended petition for writ of habeas corpus on November 8, 2013. On April 2, 2014, the Court dismissed Petitioner's motion for stay and abeyance as moot, dismissed ground one of the federal petition as a state question not cognizable in a federal habeas proceeding, and ordered Respondent to respond to the petition.

## III.   Standard of Review

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000).  On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed thereafter.  *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997).  Under the statutory terms, the petition in this case is governed by AEDPA's provisions because Petitioner filed it after April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court.  *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring).  Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings.  *Id.*  Under AEDPA, a petitioner can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71.  To do so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision.  *Id.*  The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law."  *Id.* at 72.  The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it.  *Early v. Packer*, 537 U.S. 3, 8 (2002).  The federal court must apply the presumption that state courts know and follow the law.  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent.  *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Lockyer*, 538 U.S. at 75-76.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Thus, the AEDPA standard is difficult to

satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable.  *Harrington*, 562 U.S. at 102.

### IV.   Improper Admission of Evidence of Petitioner's Assault of His Daughter Araceli

As his fifth ground for habeas relief, Petitioner contends that the trial court erred in admitting evidence under California Evidence Code § 1108 of the uncharged offense that Petitioner had molested his daughter Araceli some 26 years earlier.  Petitioner's argument relies on California law (*People v. Falsetta*, 21 Cal. 4th 903(1999)).  The California Court of Appeal rejected Petitioner's claim, concluding that the trial court did not abuse its discretion under California Evidence Code § 352 when it elected to admit the evidence pursuant to California Evidence Code § 1108.  The state court added that in any event, given the strength of the case against Petitioner, any error was harmless.

Issues regarding the admission of evidence are matters of state law, generally outside the purview of a federal habeas court.  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009).  Basing this claim solely on California precedent, Petitioner himself acknowledges its nature as a state-law claim.

"The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process."  *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995).  "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules."  *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6 (1983).  "Although the [U.S. Supreme] Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, see *Williams*, 529 U.S. at 375 . . . , it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley*, 568 F.3d at 1101.  Since the state appellate court's disposition of Petitioner's appeal was

not contrary to or an unreasonable application of Supreme Court precedent, a federal district court may not grant the writ based on the trial court's admission of evidence of Petitioner's earlier molestation of his daughter Araceli.

**V.**      **Jury Instructions Did Not Violate Due Process**

Petitioner contends that the trial court violated his 14th Amendment right to due process by instructing the jury with CALCRIM Nos. 1191 (ground two) and 359 (ground six).  Petitioner also contends that inclusion of CALCRIM No. 359 violated his rights under the 6th Amendment.

**A.**      **Federal Habeas Review of Jury Instruction Errors**

Generally, claims of instructional error are questions of state law and are not cognizable on federal habeas review.  "It is not the province of a federal court to reexamine state court determinations of state law questions." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  "The fact that a jury instruction violates state law is not, by itself, a basis for federal habeas corpus relief." *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006).  "[A] petitioner may not transform a state-law issue into a federal one merely by asserting a violation of due process." *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997) (internal quotation marks omitted).

To prevail in a collateral attack on state court jury instructions, a petitioner must do more than prove that the instruction was erroneous.  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  Instead, the petitioner must prove that the improper instruction "by itself so infected the entire trial that the resulting conviction violated due process." *Estelle*, 502 U.S. at 72.  And even if there were constitutional error, habeas relief cannot be granted absent a "substantial and injurious effect" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

A federal court's review of a claim of instructional error is highly deferential. *Masoner v. Thurman*, 996 F.2d 1003, 1006 (9th Cir. 1993).  A reviewing court may not judge the instruction in isolation but must consider the context of the entire record and of the instructions as a whole.

15

*Id.* The mere possibility of a different verdict is too speculative to justify a finding of constitutional error. *Henderson*, 431 U.S. at 157. "Where the jury verdict is complete, but based upon ambiguous instructions, the federal court, in a habeas petition, will not disturb the verdict unless 'there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Solis v. Garcia*, 219 F.3d 922, 927 (9th Cir. 2000) (quoting *Estelle*, 502 U.S. at 72).

Even when the trial court has made an error in the instruction, a habeas petitioner is only entitled to relief if the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). A state prisoner is not entitled to federal habeas relief unless the instructional error resulted in "actual prejudice." *Brecht*, 507 U.S. at 637. A violation of due process occurs only when the instructional error results in the trial being fundamentally unfair. *Estelle*, 502 U.S. at 72-73; *Duckett v. Godinez*, 67 F.3d 734, 746 (9th Cir. 1995). If the court is convinced that the error did not influence the jury, or had little effect, the judgment should stand. *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995).

**B.      Jury Instructions Regarding Evidence of Petitioner's Assault of Araceli Are A Matter of State Law Outside Federal Habeas Jurisdiction**

As his second ground for relief, Petitioner contends that the trial court's instructing the jury using CALCRIM No. 1191 was prejudicial, permitting the jury to convict him based on Araceli's claim, that she had been abused as a child, which was a remote uncharged offense. Petitioner concedes that he did not object to the instruction before the trial court. Respondent contends that the Court should decline to reach this issue since it is a question of state law. The undersigned agrees with Respondent.

**1.      The Instruction**

16

The trial court provided the CALCRIM No. 1191 instruction as follows:

> Now, the People presented evidence that [Petitioner] committed the crime of a lewd act upon a child, that child being Araceli Guzman, at the time of the alleged act that is not charged in this case.
>
> Now, the crime of lewd act upon a child is defined for you in these instructions. I've already read that instruction to you.
>
> You may consider the evidence relating to Araceli Guzman only if the People have proved by what's called a preponderance of the evidence that the defendant, in fact, committed that uncharged offense. Proof by a preponderance of the evidence is, of course, different. It's a different standard than proof beyond a reasonable doubt. It's a lesser standard.
>
> A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.
>
> If the People have not met this burden of proof, that is by a preponderance of the evidence, you must disregard this evidence entirely.
>
> Now if you decide that [Petitioner] committed the uncharged offense, you may, but are not required to, conclude from that evidence that [Petitioner] was disposed or inclined to commit sexual offenses and based on that decision also conclude that [Petitioner] was likely to commit and did commit the crimes of lewd act upon a child and forcible lewd act upon a child as charged here. If you conclude that [Petitioner] committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that [Petitioner] is guilty of lewd act upon a child and forcible lewd act upon a child. The People must still prove each charge beyond a reasonable doubt.
>
> Do not consider this evidence for any other purpose except for the limited purpose that I have described to you.

8 RT 1257:15-1258:25.

## 2.      **State Court Decision**

Having previously rejected Petitioner's claim that the trial court erred in admitting evidence of his earlier assaults on his daughter Araceli, the Court of Appeal quickly disposed of the related instructional claim:

> [Petitioner] contends that the evidence did not support the giving of CALCRIM No, 1191 on the prior offense evidence. He does not challenge the instruction itself, but asserts that the evidence was insufficient to prove his predisposition and thereby support the instruction. He maintains that even if the prior offenses were relevant and admissible, they still did not reasonably prove his

17

> propensity to commit sexual offenses 20 years later. Lastly, he adds that even if the offenses did prove a propensity 20 years later, they did not prove a propensity to commit the forcible acts charged in counts 4 through 13.
>
> We have already concluded that the evidence of [Petitioner's] prior offenses against Araceli was properly omitted. The evidence provided ample evidence to support the giving of CALCRIM No. 1191.

*Gonzales*, 2011 WL 5946927 at *13.

### 3.   The Trial Court's Providing CALCRIM No. 1191 Was a Matter of State Law and Not Cognizable in Federal Habeas Review

Federal habeas relief is available to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 328 U.S.C. § 2254(a). Petitioner's challenge of the jury instructions repeats his challenge to the admission of evidence of his sexual assault of Araceli under California Evidence Code § 1108, namely, that the evidence was insufficient and too remote to prove propensity to sexually assault children. To the extent that this issue repeats the evidentiary challenge, it too is a state law issue that is not within the scope of federal habeas jurisdiction. *Estelle*, 502 U.S. at 75. The state court acted reasonably in denying this claim.

### C.   Jury Instruction on Corpus Delicti Did Not Lessen the Burden of Proof

Petitioner contends that when considered in conjunction with CALCRIM No. 1191, the trial court's use of CALCRIM No. 359 diluted the prosecution's burden to prove that Petitioner committed the charged crimes. Respondent again responds that CALCRIM No. 359 is a matter of state law outside the Court's jurisdiction in a federal habeas proceeding.

### 1.   The Jury Instructions Given at Trial

California law requires trial courts to instruct on corpus delicti whenever the defendant's extrajudicial statements are part of the prosecution's evidence. CALCRIM No. 359, Bench Notes (citing *People v. Howk*, 56 Cal. 2d 687, 707 (1961)). Accordingly, the trial court gave the jury

the following instruction:

> The defendant may not be convicted of any crime based on his out-of-court statements alone.  You may only rely on the defendant's out-of-court statements to convict him if you conclude that other evidence shows that the charged crime was committed.
>
> That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.
>
> The identity of the person who committed the crime may be proved by the defendant's statements alone.
>
> You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt.

8 RT 1253:1-14.

## 2.      State Court Decision

The Court of Appeal rejected Petitioner's claim, finding that any error was harmless.  It explained that the corpus delicti rule, which has its roots in the common law, "is intended to ensure that [a criminal defendant] will not be falsely convicted, by his or her untested words alone, of a crime that never happened." *Gonzalez*, 2011 WL 5946927 at *13 (quoting *People v. Alvarez*, 27 Cal. 4th 1161, 1169(2002)).  The rule requires the prosecution to prove the body of the crime itself independent of a defendant's extrajudicial statements.  *Gonzalez*, 2011 WL 5946927 at *13 (quoting *People v. Sapp,* 31 Cal. 4th 240, 303 (2003)).  Because Petitioner's extrajudicial statements in this case concerned the uncharged assault of Petitioner's daughter Araceli, Petitioner contended that the corpus delicti rule did not apply and the instruction was inappropriately given. *Gonzalez*, 2011 WL 5946927 at *13.  According to Petitioner, giving the corpus delicti instruction when the out-of-court statement did not concern any of the charged crimes "diluted the prosecution's burden of proof by allowing the jurors to use Petitioner's extrajudicial admission of his assault on Araceli to convict him of assaulting A. and L. based on slight evidence supporting  reasonable inference that A. and L. were assaulted." *Gonzalez*, 2011 WL 5946927 at *13.

The state court found that the evidence of Petitioner's assaults of A. and L. was so compelling that any error in presenting CALCRIM No. 359 was "harmless beyond a reasonable

19

1  doubt." *Id.* at *14.  The court added, "The overwhelming state of the evidence is enough to

2  convince us, but we also note that the court instructed the jury with CALCRIM No. 220 on proof

3  beyond a reasonable doubt, CALCRIM No. 200 on the possibility that some instructions may not

4  apply, and CALCRIM Nos. 1110 and 1111 on the elements the prosecution was required to prove

5  to obtain convictions of the sex offenses against A. and L.  Taken together, these instructions

6  dispel any notion that the jury misunderstood the requisite burden of proof." *Id.*

7                    **3.      The Harmless Error Determination Was a Matter of State Law**

8              CALCRIM No. 359 specifically instructs the jury that it may "not convict the defendant

9  unless the People have proved his guilt beyond a reasonable doubt."  The instruction tells the jury

10  that "a defendant may not be convicted of any crime based on his out-of-court statements alone"

11  and that it may "only rely on the defendant's out-of-court statements to convict him if . . . other

12  evidence shows that the charged crime was committed."   When the substance of CALCRIM No.

13  359 is kept in mind, Petitioner's argument that giving the instruction confused the jury and made

14  the jury more likely to convict Petitioner of the charges involving his abuse of A. and L. based on

15  Petitioner's out-of-court statements concerning his earlier abuse of Araceli appears illogical.  This

16  is because Petitioner is not really objecting to the trial court's inclusion of CALCRIM No. 359

17  but is actually repeating his argument that the trial court should not have admitted evidence of

18  Petitioner's earlier molestation of Araceli because it was irrelevant and prejudicial and tended to

19  show that Petitioner "was disposed to commit sexual offenses." Doc. 11 at 49-50.

20              As discussed above, the trial court's admission of evidence concerning Petitioner's sexual

21  assault of his daughter Araceli is a question of state law that is not within the scope of federal

22  habeas relief.  Petitioner's challenge to CALCRIM No. 359 seeks to circumvent that lack of

23  jurisdiction by coloring the admission of the evidence of the assault on Araceli as a due process

24  error.  A petitioner cannot circumvent the limits of federal habeas jurisdiction by characterizing a

25  state evidentiary determination as a due process issue. *Langford*, 110 F.3d at 1389.

26              When a federal district court reviews state jury instructions, the federal court generally

27  must defer to the state court's determination of state law.  "It is not the province of a federal court

28  to reexamine state court determinations of state law questions." *Estelle*, 502 U.S. at 71-72.   The

1    Court should decline to address Petitioner's challenge to the trial court's instructing the jury with

2    CALCRIM No. 359.

3    **VI.    Denial of Continuance to Obtain Discovery Did Not Violate Due Process**

4        Relying on California state law, Petitioner contends in his fourth ground for relief that the

5    trial court "committed error of constitutional magnitude" when it refused to grant his motion for a

6    continuance to seek a copy of the 1984 police reports of Araceli and Teresa's allegations that

7    Petitioner assaulted them.  Respondent counters that because Petitioner has failed to demonstrate

8    any actual prejudice arising from the trial court's denying the continuance motion, habeas relief is

9    not warranted.

10        **A.    Factual and Procedural Background**

11        On the morning of January 25, 2010, Petitioner's counsel moved for a continuance to

12    review or obtain various items of additional evidence. 2 RT 8-9.  The argument focused on the

13    prosecution's failure to provide (1) specific contact information for three of A.'s friends, Mariah

14    Taylor, Maricruz Lara, and Nicole Navarette, whose police interviews had been produced in

15    discovery, and (2) reports generated when Araceli disclosed Petitioner's abuse some twenty years

16    earlier, including CPS, school, and police reports.[9]  Although the contention of the habeas petition

17    is based on Petitioner's need to obtain the police report of Petitioner's abuse of Araceli, the scope

18    of the motion to compel was broad and equally, if not more, focused on Petitioner's inability to

19    interview A.'s friends.

20        Initially, Petitioner contended that the People had failed to facilitate defense contact with

21    A.'s friends, although all three young women lived in the community and the prosecution

22    interviews had been conducted by arrangements through the local high school.  As the arguments

23    progressed, Petitioner's attorney was unclear about whether he sought a discovery order or a

24    continuance:

25        With respect to the—there's this 20-year-old case hovering over all

26    _____

[9] Additional discussion concerned the prosecution's contact the prior weekend with another woman who reportedly
27    had been assaulted by Petitioner in the distant past.  The prosecutor represented that when its investigator made
     contact, the woman confirmed that she had been sexually assaulted by Petitioner but expressed unwillingness to be a
28    witness in the pending prosecution.   After the prosecution represented that it did not intend to call the woman in
     question as a trial witness, defense counsel did not pursue the matter further.

this, and the—the person in this case, one of the—my client's daughter had made allegations way back 20 years ago. This is part of the motion.

There apparently was an investigation by the District Attorney's Office's [investigator] Gregg White, who tried to secure the CPS reports, as well as the school records. I did and apparently was told they've been purged or destroyed. However, I know there was [*sic*] police reports generated according to Araceli Guzman, and if there are police reports generated, I don't have those. I don't know if the People have those. I know that they would have access to them.

I know they intend to call the—I guess the alleged victim in that case, although she's not included in this report, Ms. A. Guzman, and if they do intend to call her and there is [*sic*] police reports to impeach her, I would like a copy of those.

I know that there was a witness that I discovered who contradicts her—her allegations, but if there's police reports, I don't have them yet and I have requested those.

2 RT 37:7-38:3.

After the trial judge observed that counsel's argument seemed to be a discovery request, not a motion to continue, Petitioner's counsel contended that the lack of discovery formed a basis for the continuance request. Counsel conceded that he had not filed a timely motion regarding the alleged discovery violations and that he did not know if the prosecution had police reports, but argued that the People had better access to police reports than he did.

The deputy district attorney stated that District Attorney's Office's Investigator White had tried to secure police reports but had been unsuccessful. Police Detective Klassen testified that he had run the names associated with the report but had been unsuccessful, perhaps because the reports were so old and had been mis-archived or destroyed.[10] When Petitioner's counsel attempted to examine Klassen about the extent of White's efforts to locate the police reports, the trial court stopped him, pointed out that Klassen could not testify regarding White's actions, and asked counsel if he had subpoenaed White to testify regarding the motion. Counsel replied that he had simply assumed that White would be present (White was not in court) and began to argue a motion in limine, which the court found not to be ripe pending resolution of the continuance motion. Petitioner's counsel then argued for a continuance to permit further discovery:

---

[10] After the motion for continuance had already been denied, the prosecution learned that Araceli had used a different name at the time of the assault. The police report was identified but was not recoverable due to technical difficulties.

> [W]hat I've submitted to the court in my motion, written declarations and what I have additional discovery I received since then, that's what I'm submitting to the court and asking a continuance, not a long continuance, I don't need a whole month, but I do need time to subpoena these people to question them.
>
> Yes, my investigator can scramble to go find 'em.  It's just if we started the trial tomorrow, we haven't even subpoenaed some of these people, He's scrambling, we're barely going to get addresses today, and would a week help?  Probably tremendously, So I'm, not looking to put this over for a significant period of time.

2 RT 45:22-46:9.

Counsel continued in the same vein, requesting at least a week to locate and interview Taylor, Lara, and Navarette.

The State opposed the motion, noting that jury voir dire was scheduled to begin the next day.  It argued that defense counsel had known the names of A.'s three friends "for a substantial period of time," knew that they attended a local high school, and had never requested more specific contact information.  2 RT 48.  The People did not intend to call them as witnesses.  Transcripts of the interviews were less than five pages each, and an audiotape Petitioner had requested a new copy was 37 minutes long.  Since the defense would not need to present its witnesses until after the jury was seated and the prosecution case concluded, which would not occur until the following week, the People argued that no continuance was necessary.  Petitioner's counsel conceded that his investigator could question additional witnesses while counsel was at trial but contended that proceeding with trial would preclude his use of any impeachment information in cross-examination.

The trial court acknowledged Petitioner's right to a fair trial and effective assistance of counsel.  It found that the State had produced discovery on time and that defense counsel had the information about which he now sought a continuance for "quite some period of time."  2 AR 50:9.  To the extent that the request for a continuance related to the testimony of Taylor and Lara, those witnesses were local, equally accessible to both sides, and should have been known to the defense by the prior May (about 9 months earlier) had it promptly reviewed the discovery provided by the State.[11]  On the other hand, the case was "aging."  2 RT 52:26.

---

[11] Earlier in the hearing, defense counsel stated that although it had CDs of the statements and interviews much

1    Defense counsel estimated that it needed an additional week to investigate; the parties

2    agreed that at least a week would be available to prepare the defense case while the parties chose

3    a jury and the State presented its case.  Taking all factors into account, the trial court denied the

4    continuance motion.

5        **B.**    **State Court Opinion**

6        Petitioner raised this issue in his state petition for writ of habeas corpus.  The Tulare

7    County Superior Court rejected the claim as not supported by the evidence.  *In re Luis Aldana*

8    *Gonzalez* (Tulare Cty. May 2, 2013) (No. 282554) (Lodged Doc. 21 at ¶ 4).  The court stated,

9    "Petitioner fails to establish how any continuance would have benefitted petitioner or changed the

10   outcome of trial."  *Id.*

11       **C.**    **Denial of Continuance to Secure Evidence Did Not Violate Due Process**

12       Trial courts are accorded broad discretion on matters regarding continuances.  *See Morris*

13   *v. Slappy*, 461 U.S. 1, 11-12 (1983); *Unger v. Sarafite*, 376 U.S. 575, 589 (1964).  A trial court

14   abuses its discretion if it arbitrarily insists "upon expeditiousness in the face of a justifiable

15   request for delay."  *Morris*, 461 U.S. at 11-12.

16       In the Ninth Circuit, a court may consider four factors to determine whether a trial court's

17   denial of a continuance request was an abuse of discretion: (1) the degree of appellant's diligence

18   before requesting a continuance; (2) whether the grant of a continuance would have served a

19   useful purpose; (3) the inconvenience that granting a continuance would cause to the court or the

20   government; and (4) the prejudice to appellant in denying the continuance.  *United States v. Flynt*,

21   756 F.2d 1352, 1358-61 (9th Cir. 1985).  "These factors must be considered together, and the

22   weight given to any one may vary from case to case."  *Armant v. Marquez*, 772 F.2d 552, 556 (9th

23   Cir. 1985); *Flynt*, 756 F.2d at 1359.  However the court weighs the factors, the appellant must

24   demonstrate actual prejudice resulting from the court's denial of the motion.  *Gallego v.*

25   *McDaniel*, 124 F.3d 1065, 1072 *(9th Cir. 1997).

26       The record supported the trial court's finding that defense counsel had not acted diligently

27   earlier, because of delays in securing an investigator, the defense had not reviewed the materials until the prior
     month.  It sought additional time to compare its transcripts of the statements and interviews with the video recordings
28   and with transcripts prepared by the prosecution.

1    to pursue the discovery that he sought on the eve of trial.  Although he had the transcripts and

2    video recordings of the prosecution's interviews with A.'s friends at about the same time he took

3    over as Petitioner's counsel (May 2009), counsel delayed reviewing the materials until the month

4    before trial was scheduled.  He never filed a timely motion to compel discovery or even asked the

5    prosecution for the information and materials that formed the basis for the request for

6    continuance.  Because the prosecution had been unable to secure copies of any reports prepared

7    more than 20 years earlier when Araceli disclosed that she had been abused, continuing the trial

8    to secure the reports was unlikely to be useful.  Since the prosecution did not intend to call A.'s

9    friends as witnesses, there was little purpose in granting a continuance to allow the defense to

10   discover impeachment evidence.  In any event, the petition restricts its claim of error to the

11   provision of reports concerning Petitioner's alleged assault of Araceli.  The inconvenience to the

12   trial court, the prosecution, and Petitioner himself was substantial.

13        The decisive factor in this case, however, is that Petitioner demonstrates no prejudice

14   attributable to the trial court's denial of the continuance.  As the trial court found, the evidence

15   against Petitioner was overwhelming.  The state court reasonably determined that denial of the

16   continuance did not violate Petitioner's right to due process.

17   **VII.**    **<u>Petitioner's Sentence Is Not Excessive</u>**

18        Following his conviction on all thirteen counts, the trial court sentenced Petition to an

19   aggregate term of 195 years to life imprisonment.  Reasoning that his crimes were not violent and

20   that a 195-year term will be impossible to serve, Petitioner contends that this excessive sentence

21   constitutes cruel and unusual punishment.

22        **A.**    **<u>The Crimes of Which Petitioner Was Convicted</u>**

23        The jury convicted Petitioner of three counts of lewd acts against a child in violation of

24   California Penal Code § 288(a) and ten counts of forcible lewd acts upon a child in violation of

25   California Penal Code § 288(b)(1).  With regard to each count, the jury found to be true the

26   aggravating factors set forth in Penal Code § 1203.066(a)(8) (substantial sexual contact with a

27   child younger than 14 years) and Penal Code §667.61(b) (multiple victims).  The trial court

28   imposed a sentence of 15 years to life in prison on each count, to be served consecutively.

1

### B.     State Court Opinion

2

The California Court of Appeal rejected Petitioner's claim that because the trial court

3

mistakenly believed that consecutive sentences were required for the 13 convictions, it failed to

4

exercise its sentencing discretion.  "[T]he transcript of the sentencing hearing unambiguously

5

demonstrates that the court not only was aware of its discretion (the probation officer's report

6

even recommended concurrent sentences on some counts), but was so disturbed by the case that it

7

would have imposed an even greater sentence if it could have done so."  *Gonzalez*, 2011 WL

8

5946927 at *15.  The trial court stated:

9

> I am going to sentence you to 195 years to life. That is not the death
> penalty.  The death penalty is not allowed in these circumstances.

10

> Whether it should be or not is not for me to decide, but I can say to
> you, and I will say to your family that for all intents and purposes,

11

> you are dead to the world, and that is appropriate, and that is just.
> You should never, ever, ever be released from prison, and it is my

12

> intent that that should be accomplished by the sentence I am about
> to impose upon you.

13

*Gonzalez*, 2011 WL 5946927 at *16.

14

### C.     Petitioner's Sentence Does Not Violate the Eighth Amendment

15

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual

16

punishments inflicted."  U.S. Const., amend. VIII.  Courts determine whether punishment is cruel

17

or unusual by looking beyond historical conceptions to "the evolving standards of decency that

18

mark the progress of a maturing society."  *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quoting

19

*Trop v. Dulles*, 356 U.S. 86, 101 (1958)).  "This is because '[t]he standard of extreme cruelty is

20

not merely descriptive, but necessarily embodies a moral judgment.  The standard itself remains

21

the same, but its applicability must change as the basic mores of society change.'"  *Kennedy v.*

22

*Louisiana*, 554 U.S. 407, 419 (2008) (quoting *Furman v. Georgia*, 408 U.S. 238, 382 (1972)

23

(Burger, C.J., dissenting)).  "[I]t is a precept of justice that punishment for crime should be

24

graduated and proportioned to [the] offense."  *Weems v. United States*, 217 U.S. 349, 367 (1910).

25

The constitutional prohibition of cruel and unusual punishment applies "not only [to]

26

barbaric punishments, but also [to] sentences that are disproportionate to the crime committed."

27

*Solem v. Helm*, 463 U.S. 277, 284 (1983).  In federal habeas cases, whether a sentence violates

28

1  the Eighth Amendment's prohibition of cruel and unusual punishment requires the court to

2  determine whether the term is grossly disproportionate to the offense.  *Lockyer*, 538 U.S. at 72.

3      "[T]he only relevant clearly established law amenable to the 'contrary to' or

4  'unreasonable application of' framework is the gross disproportionality principle, the precise

5  contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case."  *Id.*

6  at 73.  Successful challenges based on disproportionality are "exceedingly rare."  *Solem*, 463 U.S.

7  at 289-90.

8      Supreme Court cases addressing proportionality can be categorized either as challenges to

9  term-of-years sentences or as categorical restrictions on death sentences.  *Graham v. Florida*, 560

10  U.S. 48, 59 (2010).  In term-of-years challenges, such as Petitioner's challenge in this case, the

11  Court applies a "narrow proportionality principle, that does not require strict proportionality

12  between crime and sentence but rather forbids only extreme sentences that are grossly

13  disproportionate to the crime."  *Id.* at 59-60 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 997,

14  1000-01 (1991)) (internal quotation marks omitted).  To determine disproportionality:

15
16      A court must begin by comparing the gravity of the offense and the
        severity of the sentence.  'In the rare case in which [this] threshold
17      comparison . . . leads to an inference of gross disproportionality'
        the court should then compare the defendant's sentence with the
        sentences received by other offenders in the same jurisdiction and
18      with sentences imposed for the same crime in other jurisdictions.  If
        this comparative analysis validates(s) an initial judgment that [the]
19      sentence is disproportionate, the sentence is cruel and unusual.

20      *Graham*, 560 U.S. at 60 (internal quotations omitted).

21  The Ninth Circuit summarized:

22      First, the Supreme Court has uniformly applied—and thus given
        true meaning to—the gross disproportionality principle by
23      consistently measuring the relationship between the severity of the
        punishment inflicted upon the offender and the nature and number
24      of the offenses committed, even though it has sometimes used
        different frameworks to conduct this analysis. . . . Second, the
25      Supreme Court has repeatedly stated that a court's proportionality
        analysis "should be informed by objective factors to the maximum
26      possible extent" instead of relying upon "subjective views"
        regarding the fit between the offenses and the punishment.

27      *Norris v. Morgan*, 622 F.3d 1276, 1287 (9th Cir. 2010) (internal
        citations omitted).

28

1    Considering Norris's Eighth Amendment habeas claim, the Ninth Circuit outlined the

2    procedure for determining gross proportionality:

> [W]e begin by determining whether "the crime committed and the
> sentence imposed leads to an inference of gross disproportionality."
> *Harmelin*, 501 U.S. at 1005 . . . (opinion of Kennedy, J.); *see
> Graham*, [560 U.S. at 60].  In doing so, we compare the harshness
> of the penalty imposed upon the defendant with the gravity of his
> triggering offense and criminal history.  *Ewing*, 538 U.S. at 28-29 .
> . . (plurality opinion); *accord Ramirez v. Warden*, 365 F.3d 755,
> 767-70 (9th Cir. 2004).  This analysis can consider the penological
> justifications for the state's sentencing scheme.  *Graham*, [560 U.s.
> at 71], "[the offender's] mental state and motive in committing the
> crime, [and] the actual harm caused to the victim or to society by
> his conduct,"  *id.* at [87] (opinion of Roberts, C.J.) (citing *Solem*,
> 463 U.S. at 292-94 . . .), as well as "[t]he absolute magnitude of the
> crime," *Solem*, 463 U.S. at 293 . . . ; *accord Taylor v. Lewis*, 460
> F.3d 1093, 1098 (9th Cir. 2006).

11    *Norris*, 622 F.3d at 1290.

12    Having submitted to this Court a brief that apparently was submitted to the state court,

13    Petitioner does not address the applicable federal standards.  Instead, Petitioner focusses on the

14    second of three factors articulated in *People v. Mendez*, 188 Cal. App. 4th 47, 64-65 (2010), "a

15    comparison with the punishment for more serious offenses within the jurisdiction."  Doc. 11 at

16    71.  Petitioner argues that his sentence for 13 counts of sexually assaulting children under 14

17    years old is disproportionate when compared to a 25-years-to-life sentence imposed for a single

18    count of premeditated murder.  Because Petitioner's 195-year sentence relates to 13 separate

19    terms of 15 years to life, his comparison is not apt, even if the state standard applied in a federal

20    habeas action.

21    The 9th Circuit directs the Court to compare the harshness of the penalty with the gravity

22    of the triggering offense and Petitioner's criminal history.  *Norris*, 622 F.3d at 1290.  In

23    evaluating the gravity of the offenses, the Court must look beyond the "label of the crime" to the

24    "factual specifics of the offense.  *Id.* at 1292 (quoting *Reyes v. Brown*, 399 F.3d 964, 969 (9th Cir.

25    2005)).  Relevant considerations include whether the crime involved the use of force, the degree

26    of force used, whether weapons were involved, and whether the offense threatened grave harm to

27    society.  *Ramirez v. Castro*, 365 F.3d 755, 768 (9th Cir. 2004).

28    "Sexual molestation of a child is a very serious offense."  *Cacoperdo v. Demosthenes*, 37

28

1    F.3d 504, 508 (9th Cir. 1994).  "When a child molester commits his offense, he is well aware that

2    the harm will plague the victim for a lifetime."  *Stogner v. California*, 539 U.S. 607, 651 (2003)

3    (Kennedy, J., dissenting).  The severity is exacerbated when the abuse is committed by "familial

4    figures of authority," who take advantage of young and defenseless victims, violating the child's

5    trust and using their confidential relationship with the victim to conceal the crime.  *Id.* at 652.

6    The aggregate sentence imposed on Petitioner and the state court's accompanying explanation

7    reasonably expressed societal outrage at a grandfather's repeated sexual abuse of two young

8    granddaughters.  Further, despite Petitioner's claim that his "conduct was not violent" (see Doc. 1

9    at 60 (page omitted from Doc. 11)), federal courts "have consistently held that sexual offenses

10   against young children constitute 'crimes of violence.'"  *United States v. Medina-Villa*, 567 F.3d

11   507, 515 (9th Cir. 2009).[12]

12       Although Petitioner had no criminal record at the time of conviction, he faced thirteen

13   counts alleging sexual molestation of his granddaughters A. and L.  As in *Cacoperdo*, these

14   counts were only representative of a pattern of conduct as to both children that continued over a

15   period of years.  *See* 37 F.3d 508.  In addition, the record revealed a long-term pattern of conduct

16   of Petitioner's molesting other children over a period of decades.  "The impact of these crimes on

17   the lives of the victims is extraordinarily severe."  *Cacoperdo*, 37 F.3d at 508.

18       The severity of Petitioner's conduct is also relevant.  For example, in *Norris*, defendant

19   disputed the seriousness of his conduct, the momentary touching of a young girl's genitals outside

20   of her clothing, as *de minimus*.  622 F.3d at 1292.  The Ninth Circuit rejected his characterization

21   emphasizing that as a crime against a person, it inherently required a degree of force, and that the

22   conduct involved "a purposeful touch with the purpose of sexual gratification."  *Id.*  The sexual

23

---

[12] "*See, e.g., Dos Santos v. Gonzales*, 440 F.3d 81, 84-84 (2d Cir. 2006) (holding that a conviction under a
Connecticut statute criminalizing "contact with the intimate parts ... of a child under the age of sixteen years" is a
"crime of violence"); *United States v. Ortiz–Delgado*, 451 F.3d 752, 757 (11th Cir.2006) (holding that a conviction
under California Penal Code section 288(a) is a "crime of violence"); [*United States v.] Medina–Maella*, 351 F.3d
[944,] 947 [(2003)]; [*United States v.] Pereira–Salmeron*, 337 F.3d [1148,] 1155 [(2003)]; [*United States v.] Rayo–
Valdez*, 302 F.3d [314,] 316 [(2002)] (holding that a conviction under a Texas statute criminalizing the aggravated
sexual assault of child under fourteen is a "crime of violence"); *Ramsey v. INS*, 55 F.3d 580, 583 (11th Cir.1995) (per
curiam) (holding that a conviction under a Florida statute criminalizing attempted lewd assault on a child under
sixteen is a "crime of violence"); *United States v. Reyes–Castro*,13 F.3d 377, 379 (10th Cir.1993) (holding that a
conviction under a Utah statute criminalizing the indecent touching of a child under fourteen is a "crime of
violence")."  *Medina-Villa*, 567 F.3d at 515.

1   acts inflicted on A. and L. were far more extensive and forceful than a single, brief touch through

2   clothing and were repeated on many occasions.  After reviewing defendant's criminal history,

3   which included both sexual and nonsexual offenses, the Ninth Circuit upheld his life sentence

4   without possibility of parole under Washington State's recidivist sentencing law.  *Id.* at 1295-96.

5       Convicted in Nevada of ten counts of sexually molesting his teen-aged stepdaughters,

6   Cacoperdo similarly challenged his life sentence on each count, six of which were to be served

7   consecutively.[13]  *Cacoperdo*, 37 F.3d at 506-07.   The Ninth Circuit held, "Cacoperdo's sentence

8   is neither extreme nor grossly disproportionate to his crimes."  *Id.* at 508.  In light of the

9   sentences imposed in this comparable case, Petitioner's sentence does not shock the conscience.

10      Petitioner argues that, given his advanced age (Petitioner was 62 years old when he was

11  convicted), an aggregate 195-year-to-life sentence is tantamount to his receiving a death sentence.

12  This Court has previously rejected the argument that a Petitioner's advanced age can

13  counterbalance factors indicating the propriety of a severe sentence.  *See, e.g., Higgins v.*

14  *Hedgpeth*, 2010 WL 1904866 at *24 (E.D.Cal. May 10, 2010) (No. 2:06-cv-02192-RAJ-JLW

15  HC) (rejecting 68-year old defendant's claim that a 32-year-to-life sentence was so

16  disproportionate as to constitute sentence of life without parole).

17      A comparison of the gravity of Petitioner's offenses to the sentence imposed does not

18  raise an inference of disproportionality.  The state court reasonably determined that Petitioner's

19  sentence was not constitutionally excessive.

20  **VIII.    Certificate of Appealability**

21      A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a

22  district court's denial of his petition, but may only appeal in certain circumstances.  *Miller-El v.*

23  *Cockrell*, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining whether to issue a

24  certificate of appealability is 28 U.S.C. § 2253, which provides:

25          (a) In a habeas corpus proceeding or a proceeding under section 2255
26      before a district judge, the final order shall be subject to review, on appeal, by
        the court of appeals for the circuit in which the proceeding is held.

27  _____

28  [13] Citing *Ramirez v. Arizona*, 437 F.2d 119, 120 (9th Cir. 1971), the 9th Circuit declined to consider the issue of
    consecutive versus concurrent sentences as a matter of state  law.  *Cacoperdo*, 37 F.3d at 507.

(b)  There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B)  the final order in a proceeding under section 2255.

(2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3)  The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or his claims deserving of encouragement to proceed further.  Accordingly, the Court declines to issue a certificate of appealability.

## IX.    <u>Conclusion and Recommendation</u>

The undersigned recommends that the Court deny the Petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

31

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1).  Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections.  The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   __**September 27, 2016**__          _____ /s/ *Sheila K. Oberto* _____

                                                                UNITED STATES MAGISTRATE JUDGE